```
                  UNITED STATES DISTRICT COURT

                    DISTRICT OF NEW HAMPSHIRE
```

Cynthia Mailloux and
M&D Cycles, Inc.,
     Plaintiffs

     v.                                  Case No. 22-cv-171-SM
                                         Opinion No. 2023 DNH 121

American Honda Motor Co., Inc.,
     Defendant


**O R D E R**

Cynthia Mailloux is the Director and President of M&D Cycles, Inc., a dealership that sold and serviced Honda motorcycles, ATV's, multi-purpose utility vehicles, and scooters. In early 2018, Mailloux decided to sell the real estate from which she had been operating the dealership. So, in March of that year, she notified American Honda that M&D was terminating its relationship with Honda. In this lawsuit, Mailloux and M&D Cycles allege that American Honda failed to meet its obligation to repurchase various parts, specialized tools, and Honda-branded signage, all in violation of N.H. Rev. Stat. Ann. ("RSA") 357-C:7. According to plaintiffs, Honda refused to make roughly $100,000 of payments it was obligated to make under the statute.

Honda did make several payments to plaintiffs over the course of roughly eight months, and it denies that it breached any of its statutory obligations to the plaintiffs. Arguing that there are no genuinely disputed material facts, Honda moves for summary judgment. For the reasons given, that motion is denied.

## Standard of Review

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted). Where a genuine dispute of material facts exists, such a dispute must "be resolved by a trier of fact," not by the court on

summary judgment.  Kelley v. LaForce, 288 F.3d 1, 9 (1st Cir. 2002).

## Background

By letter dated March 3, 2018, Mailloux notified American Honda that she was terminating her Honda Dealer's Sales and Service Agreement, effective March 17, 2018.  In that notice, Mailloux called Honda's attention to the parties' respective rights and obligations under RSA 357-C and asked that Honda repurchase her inventory of new parts, specialty tools, products, and Honda signage.

According to Honda, it paid plaintiffs all sums to which they were entitled under RSA 357-C and for which plaintiffs had (in Honda's opinion) submitted proper supporting documentation.  Honda says the sums it refused to pay were either: (a) submitted to Honda in an "untimely" manner and/or insufficiently documented (again, in Honda's opinion); or (b) were not covered by the statute.  Not surprisingly, plaintiffs disagree on both points.

## Discussion

Plaintiffs seek from Honda the unreimbursed cost of various items falling into five statutory categories:

3

1. Insurance on plaintiffs' inventory of new motor vehicles from the date of termination through the date on which Honda retrieved them, pursuant to RSA 357-C VI, subsection (a).

2. New parts and accessories, pursuant to subsection (b);

3. Honda-branded signage, pursuant to subsection (c);

4. Special tools, pursuant to subsection (d); and

5. Packing, loading, and shipping the items listed above, pursuant to subsection (e).

Additionally, plaintiffs seek reimbursement for two categories of items not specifically mentioned in the statute: the costs associated with storing the vehicles, parts, and signs while plaintiffs catalogued them and prepared them for return to Honda, and a significant number of service manuals that plaintiffs say Honda required them to purchase as a condition of operating the franchise.

## Discussion

I. <u>The Statute Does not Impose Specific Time Limitations on Franchisees</u>.

The statute at issue provides that, "within 90 days of the termination, cancellation, or nonrenewal of a motor vehicle franchise . . . the <u>motor vehicle franchisor shall</u> pay to the

4

motor vehicle dealer" certain specified costs.  RSA 357-C:7 VI.  The statute further provides that:

> The payments required by paragraph[] VI . . . and any other money owed the franchisee, shall be made within 90 days of the effective date of the termination.  The manufacturer shall pay the franchisee an additional 5 percent per month of the amount due for any payment not made within 90 days of the effective date of termination.

RSA 357-C:IX.  Honda reads that statute as implicitly imposing upon franchisees the reciprocal obligation to provide the manufacturer with all documents necessary to support the claimed reimbursements, completed to the manufacturer's satisfaction, within that same 90-day timeframe.  And, because plaintiffs failed – at least in Honda's view - to provide documentation it deemed satisfactory to justify various payments plaintiffs sought within the 90-day window (i.e., on or before June 15, 2018), Honda felt at liberty to deny them.  Honda's interpretation of the statute is incorrect.

   RSA 357-C was enacted to protect motor vehicle dealers like Mailloux from potentially predatory and unfair practices by manufacturers.  See, e.g. Strike Four, LLC v. Nissan N. Am., Inc., 164 N.H. 729, 745 (2013); Roberts v. Gen. Motors Corp., 138 N.H. 532, 536 (1994).  It should, then, be interpreted in a way that "resolve[s] all reasonable doubts in statutory

5

construction in favor of providing the broadest reasonable effect to the statute's remedial purpose."  In re Malouin, 155 N.H. 545, 553, 926 A.2d 295, 302 (2007) (construing the New Hampshire Worker's Compensation Statute).  See also Petition of State, 175 N.H. 547, 554 (2022) (liberally construing the terms of RSA 169-B to effect that statute's purpose); O'Donnell v. Allstate Indem. Co., 173 N.H. 295, 302 (2020) (noting that uninsured motorist statutes "have been liberally construed to accomplish their legislative purpose").

The 90-day timeframe for payments by the manufacturer to the franchisee is plainly one of the protections that the New Hampshire Legislature sought to afford franchisees and is designed to discourage manufacturers from dragging their feet when reimbursing franchise owners for sums plainly owed.  Should the franchisee make demand for reimbursement under the statute within that period, the manufacturer is obligated to make the payment within that period.  However, a failure (or inability) by the franchisee to complete the return of vehicle inventory, or parts, or specialized tools within that period of time does not absolve the manufacturer of its statutory repurchase obligations.  The statute provides nothing of the sort, nor does it lend itself to any reasonable interpretation that would afford a vehicle manufacturer such a windfall, particularly one

effectively controlled by the manufacturer itself.  As plaintiffs note, the return process - at least as Honda operates it - is particularly onerous and time-consuming.  It is entirely conceivable that a large dealership might necessarily require more than 90 days to complete the process.  The statute does not contemplate punishing dealers for such reasonable and foreseeable delays, nor does it absolve manufacturers from their obligations when such circumstances arise.

Moreover, as plaintiffs point out, even if they were obligated to notify Honda within 90 days of all items for which they were seeking reimbursement (they were not), they claim to have done so.  That assertion suggests a material factual dispute beyond whether notice was adequate, i.e. whether Honda waived any implied 90-day documentation period it reads into the statute.

> Honda claims Plaintiffs "failed to timely submit documentation," thereby entitling Honda to summary judgment.  But as established in the two Affidavits submitted (by conventional filing) with Plaintiffs' Memorandum in Support of Their Objection to Honda's Motion for Summary Judgment, Ms. Mailloux submitted her list of special tools to be returned on April 26, 2018, see Mailloux Affidavit at ¶ 12; her list of service manuals, also on April 26, 2018, Mailloux Aff. at ¶ 13; the list of parts to be returned (nearly 3,600 line items) on that same date (April 26, 2018), Mailloux Aff. at ¶ 14; and the signs she expected Honda to repurchase, on March 14, 2018, see Saturley Affidavit

7

> in Support of the Objection, Exhibit 5. All of those
> dates fall within the 90 days on which Honda focuses.
>
> Documentation supporting the remaining three categories
> of claims (insurance, storage, packing) was submitted
> at various times between the date of termination and
> the date when Honda closed its file (November 8, 2018).
> <u>See</u> Mailloux Affidavit at ¶s 9-11.  Attorneys for Honda
> and Ms. Mailloux exchanged correspondence and
> documentation on the claims through October 29, 2018,
> without protest that it was untimely from Honda.
> Whether these circumstances justified a reasonable
> belief by Ms. Mailloux that Honda was waiving any
> (implied) deadline for submission of documents is a
> question to be submitted to the jury.

Plaintiffs' Surreply Memorandum (document no. 29) at 5.

II. <u>Insurance</u>.

Upon termination of a franchise agreement, the statute obligates manufacturers to pay franchisees the dealer cost of any new vehicles in inventory, plus "<u>insurance costs</u> and floor plan costs from the effective date of the termination to the date that the vehicles are removed from dealership or the date the floor plan finance company is paid, whichever occurs last." RSA 357-C:7 VI(a) (emphasis supplied).  Plaintiffs allege that Honda retrieved their vehicle inventory from the dealership over the course of two days: April 23 and April 28, 2018.  Plaintiffs maintained insurance on those vehicles from March 17 (the termination date) through April 28, or a total of 43 days.

8

On June 27, Counsel for plaintiffs informed Honda that the per diem cost of that insurance was $44.18 and, therefore, Honda was responsible for reimbursing plaintiffs the sum of $1,899.74. Honda denied reimbursement. First, it claimed it was not obligated to make such a reimbursement. Then, it claimed it had not received proper documentation of the expense. Now it claims such documentation was provided too late. See Affidavit of Cynthia Mailloux (submitted conventionally) at para. 9. See also Defendant's Memorandum (document no. 17-1) at 8-9. Honda is incorrect and is plainly liable for plaintiffs' insurance costs. To the extent Honda persists in asserting that plaintiffs' documentation of such expenses is insufficient, a trier-of-fact will resolve that dispute.

III. Parts and Accessories.

On April 26, 2018, Mailloux submitted to Honda a list of nearly 3,600 new, unsold parts she held in inventory. See Mailloux Affidavit at para. 14. Honda reimbursed plaintiffs for some of those parts. But it denied reimbursement for a significant number of them, the value of which Mailloux estimates to be more than $26,000. Id.

Under New Hampshire law, a motor vehicle manufacturer must reimburse a franchisee:

9

> The dealer cost of each new, unused, undamaged, and unsold <u>part or accessory</u> if such part or accessory is <u>in the current parts catalog</u>, was purchased from the manufacturer or distributor or from a subsidiary or affiliated company or authorized vendor, and is still in the original, resalable merchandising package and in unbroken lots, except that in the case of sheet metal, a comparable substitute for the original package may be used.  Any part or accessory that is <u>available to be purchased from the manufacturer</u> on the date the notice of termination issued shall be considered to be included in the current parts catalog.

RSA 357-C:7 VI(b) (emphasis supplied).  According to Honda, "all the parts that American Honda declined to repurchase had <u>part numbers</u> that were not listed in American Honda's parts catalog at the time of American Honda's review."  Affidavit of Bill Savino, Department Lead-Sales Support, American Honda Power Sports & Product Division (document no. 19) at para. 12 (emphasis supplied).

But, say plaintiffs, while Honda may have changed those part <u>numbers</u>, the products themselves were still available "in the current parts catalog."  RSA 357-C:VI(b).  <u>See</u> Mailloux Affidavit at para. 14.  That plainly raises a genuine issue of material fact – that is, whether the parts themselves remained the same, despite the change in product number.

10

IV. <u>Signage</u>.

According to Mailloux, she tendered five signs to Honda for repurchase, one of which was still in its original shipping crate and for which she had paid more than $5,600. But, says Honda, its "business practice" is to "repurchase signage <u>under five years old</u> in accordance with its policy to apply a <u>five-year straight line depreciation schedule</u>." Defendant's Memorandum (document no. 17-1) at 14 (emphasis supplied). Honda refused to repurchase any of the signs, claiming they were too old and displayed a legitimate, but outdated, trademark. <u>Id</u>. <u>See also</u> Savino Affidavit at para. 8 ("When American Honda receives a request from a dealer to repurchase signage, American Honda determines whether the signage displays then-current Honda trademark. If it does not, it is not eligible for repurchase. Subject to any applicable state law, American Honda also applies a five-year straight line depreciation to signage, such that signage that is more than five years old typically is considered to have zero fair market value.").

Honda's "business policy" is not consistent with the requirements of the statute, which obligate the manufacture to reimburse the franchisee:

> (c) The fair market value of each <u>undamaged sign</u> owned by the dealer which <u>bears</u> <u>a</u> <u>trademark</u>, trade name, or

11

> commercial symbol <u>used or claimed</u> <u>by the manufacturer</u>, distributor, or branch or division thereof if such sign was purchased from or at the request of the manufacturer, distributor, or branch or division thereof.

RSA 357-C VI(c) (emphasis supplied). Assuming Honda once "claimed" (or still claims) those allegedly outdated trademarks, plaintiffs signs are eligible for repurchase. Moreover, say plaintiffs, even if the signs are old, they certainly have <u>some</u> fair market value – even if only to the collectibles market. It is a question of fact for the jury to resolve what, if any, fair market value the signs hold.

V.   <u>Specialized Tools</u>.

Mailloux submitted a list of more than 360 special tools that Honda recommended she buy, and which she did buy, from the company. <u>See</u> Mailloux Affidavit at para. 12. From that list, she says Honda purchased fewer than a dozen tools. <u>Id</u>. According to Honda, "When American Honda receives a request from a dealer to repurchase tools, American Honda determines whether the tools are in usable condition. Subject to any applicable state law, American Honda also applies a five-year straight line depreciation to tools, such that tools that are more than five years old typically are considered to have zero fair market value." Savino Affidavit at para. 9.

12

Again, Honda's business practice is inconsistent with the requirements of New Hampshire law, which provide that Honda must reimburse plaintiffs:

> the fair market value of <u>all</u> <u>special tools</u> and automotive service equipment owned by the dealer which were recommended in writing and designated as special tools and equipment by the manufacturer, distributor, or branch or division thereof and purchased from or at the request of the manufacturer or distributor, if the tools and equipment are in <u>usable and good condition, normal wear and tear excepted</u>.

RSA 357-C VI(d) (emphasis supplied). There is no limitation on the age of those tools; only the requirement that they be "usable" and in "good condition." According to Mailloux, "each of the tools I sought to return was in good condition and usable; any which did not meet that standard, I did not ask Honda to repurchase." Mailloux Affidavit at para. 12. It is, then, a question for the jury to determine the fair market value of those tools.

VI. <u>Packing and Shipping Costs</u>.

Next, say plaintiffs, they sought reimbursement from Honda for costs associated with packing and shipping the parts, signs, and tools they returned to Honda. Under the statute, Honda is obligated to reimburse plaintiffs the "cost of transporting,

13

handling, packing, and loading of motor vehicles, parts, signs, tools, and special equipment subject to repurchase by the manufacturer." RSA 357-C:7 VI(e).  According to plaintiffs,

> Ms. Mailloux supplied Honda with copies of time sheets for three employees who, between March 6 and March 31, 2018, identified, labeled, and packed the parts, signs, tools, and special equipment Ms. Mailloux sought to return, at a cost of nearly $13,000.00 to her.  Ms. Mailloux also supplied Honda a copy of the quarterly payroll tax return demonstrating that the wages had been paid to the three employees (and only them).
>
> Later in the process, Ms. Mailloux employed a third party to review the Honda Return sheets, separate the parts and tools which Honda agreed to repurchase, tag them in accordance with Honda's specification, complete the return information on the Return sheets, pack UPS boxes, and arrange the return of the items through UPS.  The cost for this service between May 11 and June 1 was 150 hours at $25/hour for a total of $3,750.00.
>
> Despite the statutory language, Honda refused to pay <u>any</u> of the packing costs.

Plaintiffs' Memorandum (document no. 23-1) at 6-7 (citations omitted).  <u>See also</u> Mailloux Affidavit at para. 10.

Honda says it refused to cover plaintiffs' costs associated with packing the return items because those claims were "untimely" and "unsupported by sufficient documentation." Defendant's Memorandum at 10-11.  Again, the parties' respective

14

positions plainly give rise to genuinely disputed material facts for the jury to resolve.

VII. <u>Storage Costs and Service Manuals</u>.

Finally, plaintiffs seek reimbursement for costs that are not specifically enumerated in the statute – that is: (a) expenses incurred to store the vehicles, parts, and signage until they were either retrieved by Honda or shipped to Honda;[1] and (b) the fair market value of more than 175 service manuals that plaintiffs say Honda required them to purchase as a condition of operating the franchise.  The claimed storage costs might be a stretch, but the record and briefing is inadequate to support a ruling either way with respect to recovery, and the reasonable amount, if recoverable, is for a jury to determine.

Lastly, on this record, it is impossible to determine whether the "service manuals" might legitimately fall within the scope of the statute (say, for example, as new and unused "accessories" or "parts" that appear in Honda's current catalog).  Neither party has adequately described the manuals or

---

[1]   It appears that Mailloux sold the property from which she had been operating the dealership.  So, it would seem – but is by no means clear – that she had to rent space in which to store, organize, label, and prepare items to be returned to Honda.  Hence, the asserted storage costs.

15

their condition, nor has either party sufficiently briefed the issue.

## Conclusion

For the forgoing reasons, as well as those set forth in plaintiffs' memoranda (document no. 23-1 and 29), defendant's motion for summary judgment (document no. 17) is denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 26, 2023

cc:   William C. Saturley, Esq.
      Kevin P. Polansky, Esq.
      Tracy M. Waugh, Esq.